Good morning. May it please the Court, my name is Keith Bullock. I am counsel for the Operative Plasters and Cement Masons International Association and Plasters Local 200. The unions are the petitioners in Case 12-70139 and cross-respondents in Case 12-70379. Both cases involve two decisions issued by the National Labor Relations Board. The first decision is a jurisdictional award issued under Section 10K of the National Labor Relations Act. The parties commonly refer to that decision as SDI 2. The second decision is an unfair labor practice decision issued by the Board pursuant to Section 8B4D of the Act, and the parties commonly refer to that decision as SDI 3. The unions' petition for review raises several issues, but I wanted to focus today on one issue that is important to any decision, and that is jurisdiction, and more specifically, that the Board lacked jurisdiction to issue the award in SDI 2. Now as a background, there are three prerequisites the Board must find before it can issue an award. First is that there are competing claims by two groups of employees. Second, that one of those groups uses prescribed means in furtherance of their claim. And three, that there is an absence of an agreed-upon method for the voluntary adjustment of the dispute. And I want to focus on the first and the third, because with respect to the first, substantial evidence does not support the Board's findings that Plasterers Local 200 had a competing claim to the work in dispute. And the work in dispute in SDI 2 was all plastering work at all public works projects assigned by standard drywall in 12 Southern California counties. The second point is that the Board's findings with respect to agreed-upon method are arbitrary and capricious and contrary to the statute. Now I want to start with the competing claims, and the Board makes two factual findings. I'm going to start with the second one first. That was that Patrick Finley made an offer to withdraw the Pullen lawsuit, which is a state court lawsuit alleging violations of California's apprenticeship laws, prevailing wage laws, if standard drywall signed an agreement covering Southern California. Just so the record's clear, Patrick Finley has some association with Plasterers. Well, that's my next point. But the fact that the record shows that Patrick Finley is the he has no affiliation with the Plasterers Local. So, counsel, we're talking about a finding of fact. Yes, we are. And what's the appropriate standard of review for us? Substantial evidence, Your Honor. With regards to what Mr. Finley said, when you take the substantial evidence standard and you look at what's in the record, both what the Board relied on, which was the testimony of the Vice President, Blaine Kaya, and what else was in the record, you get a completely different picture. The meeting between Mr. Kaya and Mr. Finley took place in Las Vegas. Mr. Kaya testified that the meeting was to sign a collective bargaining agreement for Southern Nevada. Mr. Finley was accompanied not by a Local 200 representative, but by a local union representative from Southern Nevada, Local 797. Forgive me for interrupting, but I want to make sure you get a chance to answer my question. And about this part of your briefs, or I should say briefs, because this appears in several of the briefs, but I think you're right about the standard. And it strikes me that on, because we're in appellate court, and because there's evidence going both ways, that what your briefs were arguing to me, and what I think what you're arguing now, is that you think a different decision, a different finding of fact ought to have been made. But we're really looking to see whether there is substantial evidence to support the finding. So why was there error? Well, our argument is, is that there really is only one finding. It's the exact opposite of what the Board made. Because, and this goes to what Mr. Kaya actually testified. You mean, you mean your position is only one finding could have been made? Yes. Or what do you mean by that? Only one finding could have been made. All right. And it was the opposite of what the Board made. Mr. Kaya, and this particularly goes to Mr. Kaya's own testimony, which was at page 563 and 564 of the appendix, or the excerpts of record, where he testified, quote, when we were discussing and negotiating the Las Vegas agreement, I basically asked them to drop all lawsuits and all the kinds of complaints they had in California, and I would sign in Vegas, end quote, to which Mr. Finley said he would try. The evidence shows that the discussion of dropping the lawsuit was with respect to Southern Nevada, not Southern California. Now, there's another finding that the Board makes with respect to the claim. Couldn't you just say that Kaya, is it Kaya? Kaya, Boyin Kaya, yes. Asked to drop all lawsuits in California? His offer was, if you drop all the lawsuits in California, I'll sign in Nevada. So, and when Finley says, I will try, is that evidence that Finley would try to drop the lawsuits in California? But that's not evidence in support of a competing claim to work in Southern California. Well, that depends on what the lawsuits are seeking. If Mr. Finley said, I would drop the lawsuit if you sign an agreement in Southern California, that's evidence of a competing claim to work in Southern California. No, no, you're parsing it too finely. Here are two men in Nevada, in Las Vegas, trying to make a deal, and Kaya says, I'll sign if you get rid of the lawsuits in California. And Finley says, I'll try to do that. Now, doesn't that mean the Pullen lawsuit? No. No reasonable person could find that that meant the Pullen lawsuit? Well, no reasonable person could find an offer to withdraw the Pullen lawsuit in return for work in Nevada constitutes a claim for work in Southern California. Well, but the Pullen lawsuit was work in Southern California, right? Well, that's because it alleged to state law regarding the apprentice, the employment and payment of plans. In California. Yes. Right. Why can't we take the Pullen lawsuit as such as the grounds to establish that there was a disputed claim for work? That's my second point. And the reason is, is that a claim that an employer has to comply with state law with regards to the employment of apprentices is far different than a claim that all work should be, all work in dispute should be assigned to a particular union. The Pullen lawsuit addresses only apprentices, but one does not plaster buildings by apprentices alone. There are journeymen who perform work, and the ratio in the Pullen lawsuit noted that it's one apprentice hour for every five journeymen. There is no claim with respect to journeymen in the Pullen lawsuit. But it is a claim really quintessentially about use of the apprentices and opposing counsel's argument that they've made in the briefing anyway, unless it's going to change today. I understand their argument to be that your client is the one that had the apprentice training program. Those were your folks. We're demanding to get that work. At that time. That's correct. Okay, so. But what the lawsuit didn't say is that the local union should be the one representing those employees. And the evidence shows that Standard Drywall in the past used the program, got apprentices, and even in a couple instances noted that the apprentices would be represented by the carpenters as opposed to the plasters. And there was no objection to it. When you're talking about a jurisdictional dispute, it's a question of two groups of employees seeking work in dispute. In this case, you have a group represented by the carpenters and a group represented by the plasters. There's no claim by the plasters that they should be representing the employees performing the work. All they're saying is that the apprentices should be referred from the apprenticeship program. They then work under whatever terms that the Standard Drywall has agreed to with the carpenters. So I understand your answer to Judge O'Scanlan's question to be that the Poland lawsuit isn't sufficient, isn't substantial evidence because it didn't allege that, and your clients weren't asserting, that the apprentices would have to be represented by the plasterers. That's correct. And in fact, they testified to that at the 10K hearing. But the board never addressed that issue in the underlying award. Now, finally, I see I have a minute left. I wanted just to touch on the agreed-upon method. It's our argument, generally speaking, that the statement by Mr. Finley and that the lawsuit do not constitute a claim. So therefore, there's no claim to 97 projects throughout Southern California. But there is a claim to three projects. And that was evidenced by the complaint that was filed with the plan for the settlement of the jurisdictional disputes in the construction industry. Those three projects arose under the Los Angeles Unified School District Project Stabilization Agreement. That agreement had a plan to resolve jurisdictional disputes. The board has always held that when all parties are bound to a plan, that the board will withhold jurisdiction. In fact, it says it's barred. Right. We understand that. And the argument is it didn't cover all of the 97 disputes. So do you want to get to that point? Well, our argument is that Congress has always said that a private plan trumps the board. And the board has previously found, even when the plan does not cover the entire dispute, as such as the Plummer's Local 761 case, that they will bifurcate some of the part that is covered out and leave the rest to be decided. I am now at ten minutes, so I will stop the slide. Thank you. We have five minutes, and then I have five for rebuttal. May it please the court. My name is Mark Bennett. I represent the petitioner and the intervener, standard drywall, as does my partner, Steve Schultz, who is also at counsel's table. The five minutes I'm going to spend here is to discuss why we feel that the board should have issued a broad order in the first standard drywall case. But before I do that, I want to clarify what I think is a liberty that's been taken by counsel on the record with respect to the agreed-upon method. That he claims was agreed to by standard drywall on these three projects. The record does not show, the record in this case relies upon Exhibit 16 in the second 10-K hearing, which is standard drywall two. That exhibit came, there were four days of hearing, April 20, it was April 25, May 24, May 25, May 26. That exhibit came in on May 25, 26. The testimony that he refers to regarding standard, and the project stablishment was on April 24 and May 20, April 25 and May 24. He never talked about the only agreement that's in this record. Mr. Bennett, the plan or the PSA was signed by all parties here, correct? That's not correct. Why is it incorrect? Standard drywall never signed it. Isn't it part of the employer group, Southern California Construction Council? He's a member of the Southern California Construction Council. So he wasn't bound by the PSA, that's your position. He's not bound by the PSA based on the record that was in the standard drywall two. Okay, so. Keep in mind, the letters of assent that are referred to with the briefs from that are not in the record. They are not in the record in standard drywall two. All right, however, you did have a collective bargaining agreement with the carpenters, which did provide for an arbitration before the joint board. For the joint adjustment board, which is a separate arbitration procedure. All right, so now, tell me if you would. If the arbitration had proceeded according to the PSA, the plan to which you say your client was not a signatory and was not bound, but what would have been the arbitration entity that would have determined that arbitration under the plan? Yes, it's a plan arbitrators. They were there in this case. It was arbitrators. Kelly and arbitrators. The Greenberg. And they're there in Washington, D.C. They're appointed by the plan. All right. And if you use your collective bargaining contract with the carpenters, what is the entity that does the arbitration in that case? It would it would most likely have been assigned to arbitrator Lewis Zinkman, who is the who's generally the arbitrator that hears the cares disputes under the joint adjustment. It would be the joint adjustment board for the drywall industry. Well, it would be the joint adjustment board under the collective bargaining agreement between standard drywall and the carpenters. All right. And that's it. And the plasterers are not bound to that plan. All right. Thank you very much. That's my question. And to summarize, we think that a broad order should have should have issued in this case in the in the first case, because of the egregious and widespread actions by the plasterers after the standard drywall decision came out. And things that occurred after the standard drywall decision came out was even the plasterers proceeded with the plan to force the plan awards. They asked for another plan proceeding to cover all of Southern California, even though there was no evidence in that of the standard that standard drywall was bound to it. There's a plan for covering some of the California. They amended the pooling complaint to allege that we had to use local 200 plasters. And if you look at the pool, the various versions of the pooling complaint, the pooling complaint alleges that all of the plot, all of the premises are local 200 members, that they're represented by local 200, the local 200 is the one who's going to finance it. That that's all in the pooling complaint, the various versions of the complaint that are in the record. They also Mr. Mr. Bennett, where does the fiber board case fit in this issue? I'm not I'm I'm not I mean, I've heard of fiber board, but I don't know how it how you think that you're on the things that might apply. Well, I just wondered if you had a comment. OK, I don't you know, it's not been raised, so I don't I don't see that it's been an issue. And so, counsel, this is an abuse of discretion standard, right? Yes. Why was it an abuse of discretion for the board to enter the remedial order it entered? Because and because of the evidence, the case is so overwhelming that the union was engaged in egregious and widespread unfair labor practices that they would not stop. The issue is that it was not an abuse of discretion. Correct. The NLRB use of discretion by not entering the broader order on the first case. You have no problem with the order that was entered in the second case. Good morning, Your Honors. Julie Bordeaux from the National Labor Relations Board. If I could, I'd like to take a second and step back to look at the big picture, because at first blush, these cases may seem rather complicated factually. But there's a fundamental principle at stake, and that is that Congress made Section 10K of the act and the proceedings implemented under Section 10K to be the final and binding method of resolving disputes between competing unions, jurisdictional disputes for work. In this case, the board issued two such awards, the first covering a project at Cal State Fullerton, and the second covering a broad 12-county area in Southern California consisting of 97 projects. And that once, as soon as the board issued particularly the second 10K decision in December 2006, the plasterers, as the board found, violated Section 8B42D of the act by continuing to process not only the Pullen lawsuit, but also the tortious interference lawsuit, which directly contravened particularly the second 10K award, and to pursue multiple grievances to ask the plan in December, I'm sorry, January 2007 to pursue work that the board had awarded to the carpenters throughout the 12-county area. And that is really the principle at stake. It's the primacy. Once the board has issued a Section 10K award, it is supposed to resolve these disputes so that the employer is not caught in the crosshairs and there is no longer a disruption to commerce. And that's the principle at stake. Another principle at stake is the board shouldn't assume jurisdiction and shouldn't get involved with determining jurisdictional disputes among competing labor unions. Well, it is. I'm sorry. If there is a voluntary method of agreement between the parties and the claim is by the plasterers that there was such an agreement and they should have proceeded under the plan or the PSA, would you address that? Certainly, Your Honor. It is true that for the board to invoke a Section 10K proceeding, it must have reasonable cause to believe that certain threshold conditions exist. One of them is that the unions have competing claims to the work, and another one is that there is no voluntary method to adjust the party's dispute. And the fundamental flaw in the plasterer's argument is that particularly the Section, the second Section 10K dispute concerned 97 job sites throughout a 12-county area. The plasterer is only claiming that three of those 97 disputes are covered by their plan. Their plan is pursuant to the Los Angeles Unified School District Project Stabilization Agreement. His argument is that they should have been bifurcated. What's your response to that? That it would not resolve, the board did not have to and appropriately exercise its discretion in not bifurcating the proceeding. And that makes complete sense because it would not have, splitting off three of them would not have resolved the overall dispute, which concerned 97 job sites and is continuing to this day with the different, the pull-in lawsuit and the tortious interference lawsuit. Did the board rely on a finding, did the board make a finding that the carpenters were bound to an alternative dispute resolution process with standard drywall? The board did note that there appeared to be another dispute resolution mechanism, namely the joint adjustment board. But the essential finding of the board is that the, it didn't need to resolve whether the parties were bound to the plasterer's plan at the three sites because in any event that would not have resolved the party's far-reaching, far-ranging overall dispute at 97 sites. I'm sorry, is the answer to my question no? The board did not make a finding about the other, whether standard drywall was bound to a different? I guess you could call it, you could call it dicta because the board did note in any event that there appeared to be a competing forum. Uh-huh. And. But you don't think the board relied on that? Well, the essential finding is that there was, the board had reasonable cause to believe that there was no private dispute resolution mechanism that would have resolved the overall dispute at issue in the second 10K case. Thank you. What's the strongest support for the finding that there was, there was, there were claims, competing claims for the work? Well, as regarding, would you like me to start with the first 10K case? Because with, with regard to that one, the, the Pullen from, from local 200 admitted that he would try to get the Pullen lawsuit dismissed if in a return for, for assignment of the work. So, so that's clear. That's strong evidence. Yes, that's very strong. Okay. And it has to be recalled that the board only had to have reasonable cause to believe that there were competing claims. So it, it's, it's really even more deferential standard of review than substantial evidence because now at the appellate level, the issue is did the board abuse its discretion in finding reasonable cause to believe there were competing claims? Because, again, it goes to once, once the 10K proceeding is invoked and an award is made, the, the purpose of it is to essentially provide labor peace. For better or for worse, one, one union is going to be the winner and the other is going to be the loser. But the overarching goal of labor peace is achieved. And if you turn to the second Section 10 case, Your Honor asked about the strongest evidence that the Plasters were claiming the work. It's the Pullen lawsuit on its face, which, which was seeking an injunction and damages essentially requiring the company Standard Drywall to use the Plaster's apprenticeship program in 12 Southern California counties. Mr. Boling has told us that that claim did not require the apprentices of SDI Standard Drywall to join the Plaster's union and that in prior years, similar claims had resulted in members of the Carpenter's union working through the apprenticeship program of the Plaster's union. Is that representation somewhat inaccurate? I think it is, Your Honor. In fact, Pullen in his testimony admitted that those apprentices would be represented by local 200. Can you give me a citation to that? I believe it's, I don't have my brief up here, but I believe it's ER, it's in our supplemental excerpts of record very early on. It's actually pages one to two. One to two of the supplemental? Of the Board's supplemental excerpts of record. Mr. Bennett asked whether employees dispatched by local 200's hiring hall, are they represented by local 200? And Pullen answered yes. And plus, the lawsuit on its face says that local 200 is seeking the work for its apprentices, for the apprenticeship program that it operates, which happens to be, or happened to be the only one in Southern California. So it follows that the work would go to its apprentices. You mean it isn't possible for a workman who is employed by Standard Drywall to enroll in the Plaster's program, apprenticeship program, and go to work for Standard Drywall and maintain his affiliation with the Carpenters? Well, I suppose it's possible for an employee to maintain a dual membership. Well, that's his argument. His argument is that the Plaster's apprentice program could have produced folks represented ultimately by the Carpenters. Did you want to respond to that? Well, but they would have had to also have been members of and represented by local 200. They could have had a membership in another labor union. Why? Isn't an apprenticeship program that they teach? I mean, an apprenticeship program means to me they teach people how to do the work. But why does going to school mean that you have to become a union member? Because once those apprentices were, went to, the objective of the Pullen lawsuit was to have apprentices represented by local 200 employed by Standard Drywall. And your citation of pages one and two was that Mr. Pullen said that whoever was dispatched from the apprenticeship program to do work for an employer would be a member of the Plaster's? Right. Would be represented by the Plaster's. And just the overall gist of the lawsuit on its face is seeking, is seeking that work.  of course, you have the testimony of Mr. Kaya. Now, the board doesn't resolve credibility, make credibility resolutions in Section 10K proceedings. But there is certainly reasonable cause to believe that based on the Pullen lawsuit and the testimony of Mr. Kaya that the Plaster's were making a claim to this work. And I just, I guess I would like to take a second to respond to Standard Drywall's challenge to the board's remedial order in this case by noting that the very next day the board issued its order in the last Standard Drywall case, which concerns yet another set of grievances that the international took to arbitration on behalf of the local for, for yet more work that was covered by the second Section 10K case. And in that case, the board issued an even broader award, remedial order than, than, than Standard Drywall had requested in the case that we're arguing now. If the court has no further questions. All right. No questions. Thank you. No questions. Thank you. Mr. Bennett, as to your claim that the first order was not broad enough, if Ms. Broydo is correct and the second order was broad enough and was issued the next day, what sort of relief are you asking from us? My concern, Your Honor, is, is there is, there is a, there is a, um, the Plaster's asking to overturn the first case. And if that were to happen, the second case, which is Standard Drywall 4, and if that were to happen, then there would not be a broad order. So long as the NLRB order in the second case is affirmed, then you're at peace with the first order. I would be. I would be. I would be. I'd like to, I was given four minutes to respond, and I'd like to address a couple of issues that were, that you asked Ms. Broydo. And that is about the, about the plan. If you look at the testimony in Standard Drywall 2, you have to take into consideration in evaluating that issue, that the Carpenters, even though they had signed the, the, a version of the PSA, they, the Carpenters had taken the position they were not bound to use the plan, because at the time that they, they signed it, they were a member of the Building and Construction Trades Council, and at the time of this dispute, they were no longer a member of the Building and Construction Trades Council, and they said, we don't have to go to the plan. That was an issue that was, so there was a dispute out there. Even the Carpenters were claiming they didn't need to go to the plan. But what the board did in that case is they gave the plasterers the benefit of the doubt, despite the miserable record that was formed in the second 10K. Gave them the benefit of the doubt, and they said, well, let's look at what, what is this dispute? It's not a dispute about three projects. It's an area-wide dispute. This will not, this, we have to resolve the dispute. And so, they said, so we're going to resolve it. We're not going to, we're not going to bifurcate it. And they, they cited a case, Spade-Preet, which, which, which is exactly what happened. And then, and then the other thing they said, the other ground that they said was, there are potentially competing claims here. Potentially conflicting awards. The Carpenters could get an award. The plasterers could get an award. It's potentially conflicting. It wouldn't resolve it. It says the board, Congress charged the board with deciding this dispute quickly and finally. But I asked counsel that question, and she responded that the board did not rely upon the risk of, of conflicting resolutions, that, that instead they sort of made the observation and just put it out there. No, Your Honor, they did. They looked at, looked at both of those issues. They said, number one, there's only three plans. They would leave 97 un, un, unresolved. And then they said, there's also potentially conflicting decisions. And your interpretation of the order is that they relied on both. It's in standard drywall to. It would, it would be on page it's 348 NLRB on page 1254. I'm looking at page 1254. And that's ER 47. Yep. They cite the Kenneth most post post case. Says, he says, he says, here's the output here, assuming arguendo, the PSA resolves the jurisdictional dispute at three of the projects. This would leave 94 projects unresolved. Further, as described above, the employers presented evidence that both its master agreement and memorandum agreement with the carpenter's provides for arbitration of jurisdictional disputes. This could, could result in conflicting awards binding on the employer. And I note that, that in their opening brief, Plaster did not take issue with that particular ruling by the board. Okay. So your answer to my question is the board relied on both. That's both. Yep. Because what they, what they wanted, what the board said, somebody is going to resolve the dispute. I understand. Thank you. Okay. I will try to address all the points that were raised. First, with respect to the, the, the project stabilization agreement, that there is evidence in SDI to that, that standard drywall signed letters of assent. The agreement itself is in the record. The agreement states that employers become bound to projects on a project-by-project basis. They sign letters of assent for each project. They're required to sign them either the time they're awarded the work or 48 hours before they begin work. The vice president testified that he signed two letters of agreement. They were for the first two projects, the high school number two and East Valley Middle School. There was no testimony about the third one, which was the LAUSD Cal Transit project, because that one hadn't started yet. So under the terms of the project stabilization agreement, they could wait until 48 hours prior to the start of work and sign the letter of assent. What about those citations? The citations for when the, they sign the letters of assent, they are in volume three of our records of record, pages 451, 453, and 455. That is in regards to the number two project. Mr. Bullock, if Standard Drywall, for some reason, refused to sign any letters of assent following the three projects of which you referred to, what would be the remedy of plasters? Well, there wouldn't be a remedy because they wouldn't be allowed to perform work on the project. Who wouldn't be allowed to perform work? Standard Drywall. Because the employer, in other words, the owners, LASUD, would not employ them. Yes. The project stabilization agreement says that in order to perform work, you must sign a letter of assent. If you don't sign a letter of assent, you can't work. Okay. So that's the basis of your saying the Standard Drywall is bound by the PSA. Yes. You can make a reasonable conclusion. As to work for the LAUSD. Agreement, yes. What about the other 12 counties? Well, it would only apply to the extent that the work is under the Los Angeles Unified School District Project Stabilization Agreement. So if they're doing work for the University of California, it doesn't apply there. But if they're doing work for the high school number 15, then it would apply there. Just the rest of the record sites for the East Valley Middle School, it's page 461 and 462. And with regards to the Caltrans Shop 7, the site that the project hadn't started is page 551. Now, with regards to the lawsuit, it was my contention that there. The Pullen lawsuit? The Pullen lawsuit, yes. It was my contention that there's nothing in the lawsuit that required Standard Drywall to recognize Local 200 with respect to apprentices who were referred out to the job site. Unions get recognition only by two means. That's a board election or voluntary recognition. It's under Section 9. The Plasters admittedly don't have either. So at page 589, Mr. Pullen was asked the following question. Does Plasters Local 200 seek to act as a collective bargaining representative for apprentices, plastering apprentices employed by Standard Drywall? The answer is no. Local 200 was simply trying to make sure that Standard Drywall adhered to its obligations under the law. It was not trying to force Standard Drywall to reassign all plastering work throughout 12 counties to Local 200 apprentices. Because the plastering work goes beyond just apprentices. It's journeymen. There's no claim with regards to journeymen there. Now, the one last thing I want to ask, as to whether they were trying to force that or not, isn't that a question of fact that we review for substantial evidence? I mean, can't the National Labor Relations Board say the pressure brought by the Pullen lawsuit as to apprentices was for the purpose of having Standard Drywall recognize plasters as to journeymen as well as apprentices? Perhaps they could. I don't think they did that in SDI 2. I thought they did. No, what they said was that in the first decision, SDI 1, they said— Reasonable cause to believe that there was pressure brought. Well, there was reasonable cause to believe that the local had a competing claim. That competing claim was the lawsuit. And the competing claim was not only to apprenticeship work, but as to journeyman's work. Well, there's no evidence of a competing claim as to journeyman's work. The lawsuit doesn't address journeyman's work. And there's nothing in the record that shows that Local 200 ever sought journeyman's work. I want to quickly thank Your Honor. All right. Have we exhausted the time allocated to parties? I don't want to have anybody complain later. All right. Thank you very much. Thank you for a very illuminating argument. And this case, these cases will stand submitted. Thank you very much.
judges: O'scannlain, Bea, Christen